Evan J. Smith
BRODSKY & SMITH
240 Mineola Boulevard
First Floor
Mineola, NY 11501
Telephone:      516.741.4977
Facsimile:      516.741.0626
esmith@brodskysmith.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| YALE DAVID,<br><br>              Plaintiff,<br><br>vs.<br><br>SCULPTOR CAPITAL MANAGEMENT, INC., MARCY ENGEL, DAVID BONANNO, WAYNE COHEN, JIMMY LEVIN, CHARMEL MAYNARD, and BHARATH SRIKRISHNAN,<br><br>              Defendants. | Case No.:<br><br>**Complaint For:**<br><br>(1)  Violation of § 14 (a) of the Securities Exchange Act of 1934<br>(2)  Violation of § 20(a) of the Securities Exchange Act of 1934<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Yale David ("Plaintiff"), by and through his attorneys, alleges upon information and belief, except for those allegations that pertain to him, which are alleged upon personal knowledge, as follows:

**SUMMARY OF THE ACTION**

1.      Plaintiff brings this stockholder action against Sculptor Capital Management, Inc. ("Sculptor" or the "Company") and the Company's Board of Directors (the "Board" or the "Individual Defendants," collectively with the Company, the "Defendants"), for violations of Sections 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") as a

result of Defendants' efforts[1] to merge with Rithm Capital Corp. ("Rithm" or "Parent"), through

merger vehicles Calder Sub, Inc., Calder Sub I, LP, Calder Sub II, LP, and Calder Sub III, LP,

("Merger Subs"), wholly owned subsidiaries of Sculptor, as a result of an unfair process, and to

enjoin an upcoming stockholder vote on a proposed merger transaction (the "Proposed

Transaction").

      2.     The terms of the Proposed Transaction were memorialized in a July 24, 2023

filing with the Securities and Exchange Commission ("SEC") on Form 8-K attaching the

definitive Agreement and Plan of Merger (the "Merger Agreement").

      3.     Under the terms of the Merger Agreement, each Class A share[2] issued and

outstanding immediately prior to the effective time will be cancelled and converted into the right

to receive $11.15 in cash, with Sculptor operating partnership unitholders receiving the

applicable amount of cash consideration in accordance with the Sculptor partnership agreements

based on such $11.15 per share price; thereafter, each certificate or book-entry formerly

---

[1] The Merger Agreement is by and among the Company and its subsidiaries Sculptor Capital LP, Sculptor Capital Advisors LP, and Sculptor Capital Advisors II LP (collectively the "Operating Partnerships"). The Operating Partnerships will each merge with a Merger Sub, and as a result of the Proposed Transaction, will become direct or indirect subsidiaries of Parent.

[2] Excluding (a) any shares of Sculptor Common Stock that are owned directly by Rithm, Merger Sub Inc., or any of their subsidiaries immediately prior to the Effective Time or held in treasury of Sculptor, (b) any shares of Sculptor Common Stock as to which appraisal rights have been properly exercised and (c) any unvested Sculptor Restricted Stock Awards to be cancelled without payment in respect thereof pursuant to Section 3.06(c) of the Merger Agreement.

If the mergers are completed, each share of Class B Common Stock will be cancelled and retired, for no consideration. However, holders of Class B Common Stock will receive consideration in cash (or, if the Rollover Condition is satisfied or waived and such holder is a Rollover Holder who has elected to participate in the Rollover, equity interests of the HoldCos pursuant to the Rollover) in respect of corresponding Partnership Units for aggregate consideration payable to such Partnership Unitholders of $167,367,690, which equates to approximately $6.90 for each LP Class A Unit and LP Class A-1 Unit and $0 for each LP Class E Unit, LP Class P Unit and LP Class P-4 Unit.

representing any of the shares of Class A Common Stock will represent only the right to receive the Public Merger Consideration. The parties also expect that Sculptor operating partnership Class A / Class A-1 unitholders will be given the opportunity, in lieu of receiving cash consideration, to roll their Sculptor partnership units into partnership units of one or more Rithm's subsidiaries. As a result of the Proposed Transaction, Sculptor will become a wholly owned subsidiary of Rithm.

4.      Thereafter, on August 21, 2023, filed a Preliminary Proxy Statement on Form PREM14A with the SEC in support of the Proposed Transaction (the "Preliminary Proxy Statement").

5.      The Proposed Transaction is unfair for several reasons.   Significantly, the Preliminary Proxy Statement fails to disclose whether the Special Committee had the ability to veto a potential transaction that was not in the best interests of shareholders.

6.      In violation of the Exchange Act, Defendants caused to be filed the materially deficient Preliminary Proxy Statement depriving Plaintiff of the proper information necessary to decide whether to vote in favor of the Proposed Transaction.  The Preliminary Proxy Statement is materially deficient, deprives Plaintiff of the information necessary to make an intelligent, informed and rational decision of whether to vote in favor of the Proposed Transaction, and is thus in violation of the Exchange Act.  As detailed below, the Preliminary Proxy Statement omits and/or misrepresents material information concerning, among other things: (a) the sales process and, in particular, certain conflicts of interest for management; (b) the financial projections for Sculptor, provided by Sculptor management to the Board and the Board's financial advisors PJT Partners LP ("PJT Partners") and J.P. Morgan Securities LLC ("J.P. Morgan") and (c) the data and inputs underlying the financial valuation analyses, if any, that purport to support the fairness

opinion created by PJT Partners and J.P. Morgan, if any, and provide to the Company and the Board.

7.      Absent judicial intervention, the Proposed Transaction will be consummated, resulting in irreparable injury to Plaintiff.

## PARTIES

8.      Plaintiff is a citizen of Florida and, at all times relevant hereto, has been a Sculptor stockholder.

9.      Defendant Sculptor is a hedge fund sponsor and provides investment advisory services to its clients. The Company caters to institutional investors, which include pension funds, fund-of-funds, foundations and endowments, corporations and other institutions, private banks and family offices. Sculptor is incorporated in Delaware and has its principal place of business at 9 West 57th Street, New York, NY, 10019.  Shares of Sculptor common stock are traded on the New York Stock Exchange ("NYSE") under the symbol "SCU."

10.     Defendant Marcy Engel ("Engel") has been a Director of the Company at all relevant times and serves as Chairperson of the Company Board.  In addition, Engel was a member of the Special Committee.

11.     Defendant David Bonanno ("Bonanno") has been a director of the Company at all relevant times.

12.     Defendant Wayne Cohen ("Cohen") has been a director of the Company at all relevant times.

13.     Defendant Jimmy Levin ("Levin") has been a director of the Company at all relevant times.

14.     Defendant Charmel Maynard ("Maynard") has been a director of the Company at all relevant times.  In addition, Maynard was a member of the Special Committee.

15.     Defendant Bharath Srikrishnan ("Srikrishnan") has been a director of the Company at all relevant times.

16.     Defendants identified in ¶¶ 10 - 15 are collectively referred to as the "Individual Defendants."

17.     Non-Party Parent Rithm is an investment manager that operates a vertically integrated mortgage platform and invests in real estate and related properties in the United States and Europe. Rithm provides capital and services to the real estate and financial services sectors. Its investment portfolio comprises mortgage servicing related assets, residential securities and loans, and single-family rental loans. Rithm qualifies as a real estate investment trust for federal income tax purposes.

18.     Non-Party Merger Subs are wholly owned subsidiaries of the Company created to effectuate the Proposed Transaction.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.  This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.  The Court has supplemental jurisdiction over any claims arising under state law pursuant to 28 U.S.C. § 1367.

20.     Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District or is an individual who is either

present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District; for example, the Company has its principal place of business in this District and the Company's stock trades on the NYSE which is headquartered in this District.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

22.     Defendant Sculptor is a hedge fund sponsor and provides investment advisory services to its clients. The Company caters to institutional investors, which include pension funds, fund-of-funds, foundations and endowments, corporations and other institutions, private banks and family offices. Sculptor also manages separate client-focused equity, fixed income, and real estate separate accounts; commingled funds; and specialized products. The Company invests in equity, fixed income and real estate markets across the world.

23.     Sculptor employs quantitative and qualitative analysis to make its investments through a combination of fundamental bottom-up research, a high degree of flexibility, and integrated risk management. For its multi-strategy portfolios, Sculptor employs strategies like convertible and derivative arbitrage, corporate credit, long/short equity special situations, buyout investments, merger arbitrage, private investments, and structured credit. Sculptor also invests in real estate and traditional real estate assets including: multifamily, office, hotel and retail, loans, portfolio acquisitions, loan pools, operating companies, structured debt products, and public securities, and non-traditional real estate assets including: gaming, distressed land

and residential, cell towers, parking, golf, debt, and senior housing. For private equity investments, Sculptor considers investments in a variety of special situations that seek to realize value through strategic sales or initial public offerings.

24.     The Company's recent first quarter 2023 performance press release, revealing financial results from the quarter preceding the announcement of the Proposed Transaction, indicated sustained and solid financial performance.  For example, in the report of the first quarter 2023 financial results dated May 4, 2023, the Company highlighted such milestones as GAAP net income attributable to Class A shareholders of $8.5 million, distributable earnings of $14.2 million, adjusted net assets of $268.6 million, accrued but unrecognized incentive income of $162.6 million, and that the Company had Assets Under Management of $36.1 billion.

25.     These results are not an anomaly, but rather, are indicative of a trend of continued success and future potential success by Sculptor.

26.     Despite this upward trajectory, the Individual Defendants have caused Sculptor to enter into the Proposed Transaction without providing requisite information to Sculptor stockholders such as Plaintiff.

***The Flawed Sales Process***

27.     As detailed in the Preliminary Proxy Statement, the process deployed by the Individual Defendants was flawed and inadequate, was conducted out of the self-interest of the Individual Defendants and was designed with only one concern in mind – to effectuate a sale of the Company by any means possible.

28.     The Preliminary Proxy Statement indicates that a committee of disinterested directors was formed to review the Proposed Transaction, but it fails to indicate whether the

committee was empowered to veto a potential transaction not in the best interests of shareholders.

29.     Additionally, the Preliminary Proxy Statement is lacking as to the nature of the confidentiality agreement entered into between the Company and Rithm, including all specific terms of any such included "don't-ask, don't-waive" provisions or standstill provisions contained therein, including, all specific conditions, if any, under which such provisions would fall away.

30.     It is not surprising, given this background to the overall sales process, that it was conducted in an inappropriate and misleading manner.

***The Proposed Transaction***

31.     On July 24, 2023, Sculptor and Rithm issued a press release announcing the Proposed Transaction.  The press release stated, in relevant part:

> NEW YORK - (BUSINESS WIRE) — Rithm Capital Corp. (NYSE: RITM; "Rithm"), an asset manager focused on the real estate and financial services industries, and Sculptor Capital Management Inc. (NYSE: SCU; "Sculptor"), a global alternative asset manager with $34 billion in assets under management ("AUM")(1), today announced entry into a definitive agreement under which Rithm will acquire Sculptor in a transaction valued at approximately $639 million(2), which includes $11.15 per Class A share of Sculptor.
>
> "This transaction is transformational for Rithm," said Michael Nierenberg, Chairman, Chief Executive Officer and President of Rithm Capital. "Sculptor's $34 billion of AUM coupled with Rithm's $7bn of permanent equity capital and $30+ billion balance sheet creates a world-class asset management business. We are very excited to bring together two organizations with strong track records, excellent management teams, and seasoned investment professionals. Sculptor has a tremendous global investment platform and we believe the combination of both our businesses will continue to deliver great long-term value for shareholders and fund investors alike."
>
> Sculptor's investment and leadership teams will continue in their roles and certain members of Sculptor leadership have agreed to vote shares held by them, representing an aggregate of approximately 26% of the outstanding Sculptor voting shares, in favor of the transaction. Upon completion of the transaction, Sculptor will operate as a subsidiary of Rithm and will continue to be led by Jimmy Levin, as CIO and Executive Managing Partner, reporting to Michael

Nierenberg, Chief Executive Officer, President, and Chairman of Rithm. Sculptor will continue to operate as is - with an intense focus on delivering risk adjusted returns on the capital with which it has been entrusted.

Jimmy Levin, Chief Investment Officer and Chief Executive Officer of Sculptor, stated "We are extremely pleased about the opportunity to combine with Rithm to capitalize on the growing opportunity set we see in our business. We are excited to leverage this combination to continue to execute on our mission of providing our fund investors with attractive investment returns. We have long sought a partner with the stable capital structure, culture and vision to help unlock the potential for our platform to deliver more and greater value to our fund investors."

Marcy Engel, Chairperson of Sculptor's Board of Directors, stated "We are thrilled to deliver a great outcome for Sculptor shareholders and an opportunity for Sculptor to continue to build on its exceptional platform. We look forward to watching the combined company grow its already strong position as a leader in the alternative asset management space."

**Strategic Rationale**

- **Significantly expands Rithm's capabilities in the alternative asset management sector:**
    - $34 billion of AUM(1) diversified across the real estate, credit and multi-strategy investing spectrum
    - Creates instant scale and broadens Rithm's product offerings and investment management capabilities
- **Combination of complementary platforms creates a compelling partner for investors:**
    - Rithm and Sculptor benefit from complementary capabilities, significantly enhancing the transaction potential and benefit to shareholders, fund investors and employees
    - Adds a long-tenured management and investment team to the Rithm platform with a strong track record
- **Potential to unlock significant opportunities to grow Sculptor:**
    - Provides capital to accelerate growth across sectors
    - Ability to augment existing Sculptor business by seeding new funds and strategies and leveraging existing infrastructure to launch complementary funds
- **Attractive transaction for Rithm and Sculptor shareholders:**
    - Represents a premium of 18% over the closing price of Sculptor's Class A shares on July 21, 2023 and a premium of 31% over the unaffected November 17, 2022 closing Class A share price of $8.50(3).
    - Expected to be neutral to Rithm's 2024 earnings and accretive in 2025

(1)     As of July 1, 2023.

(2)     Total transaction value includes upfront equity purchase price, assumption of certain unvested securities and repayment of Sculptor term loan and warrants.

(3)     November 17, 2022 is the day prior to Sculptor's announcement of the formation of a special committee of independent directors of the Sculptor Board of Directors (the "Special Committee") to explore potential transactions.

**Key Transaction Details**

Rithm will acquire Sculptor in a transaction valued at approximately $639 million(2). Sculptor Class A shareholders will receive cash consideration equal to $11.15 per share, with Sculptor operating partnership unitholders receiving the applicable amount of cash consideration in accordance with the Sculptor partnership agreements based on such $11.15 per share price. The parties also expect that, subject to the satisfaction of certain conditions, Sculptor operating partnership Class A / Class A-1 unitholders will be given the opportunity, in lieu of receiving cash consideration, to roll their Sculptor partnership units into partnership units of one or more Rithm subsidiaries. The transaction represents a premium of 18% over the closing price of Sculptor's Class A shares on July 21, 2023 and a premium of 31% over the unaffected November 17, 2022 closing Class A share price of $8.50(3).

The transaction is expected to be funded from Rithm's cash on hand and available liquidity and is expected to be accretive to Rithm shareholders in 2025.

The Sculptor Board of Directors, acting on the unanimous recommendation of the Special Committee, has unanimously approved the transaction and has recommended that Sculptor shareholders vote to approve it as well. Rithm's Board of Directors has also unanimously approved the transaction. The transaction is subject to customary closing conditions, including approvals by Sculptor's shareholders (including the approval by the holders of a majority of the outstanding shares of Class A stock not owned by Class A / A-1 unitholder shareholders or executive managing directors of Sculptor as of July 23, 2023 or the date of Sculptor's shareholder meeting to approve the transaction), certain regulatory approvals, and the receipt of certain consents. The transaction is expected to close in the fourth quarter of 2023.

### *Potential Conflicts of Interest*

32.     The breakdown of the benefits of the deal indicates that Sculptor insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders such as Plaintiff.  The Board and the Company's executive officers are conflicted because they will

have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff as a public stockholder of Sculptor.

33.     Company insiders currently own large, illiquid portions of Company stock, some of which will be exchanged for the merger consideration upon the consummation of the Proposed Transaction, not shared amongst Plaintiff and other public stockholders of the Company.

**Sculptor Capital Management, Inc.**

| Name of Beneficial Owner | Class A Common Stock[1] | | Class B Common Stock[1][2] | | |
| | Amount and Nature of Beneficial Ownership | Percent of Class[3] | Amount and Nature of Beneficial Ownership | Percent of Class[3] | Total Voting Power[3] |
| --- | --- | --- | --- | --- | --- |
| *Named Executive Officers* | | | | | |
| James S. Levin[4] | 4,108,402 | 13.9% | 9,962,307 | 30.2% | 22.5% |
| Dava Ritchea[5] | 145,107 | * | 138,000 | * | * |
| Wayne Cohen[6] | 528,915 | 1.8% | 1,492,094 | 4.5% | 3.2% |
| David Levine[7] | 73,771 | * | 222,572 | * | * |
| Hap Pollard[8] | 34,654 | * | 1 | * | * |
| *Principal Shareholders* | | | | | |
| Daniel S. Och[9] | 203,666 | * | 7,862,392 | 23.8% | 12.9% |
| Robert S. Shafir[10] | 1,829,069 | 6.2% | — | * | 2.9% |
| David Windreich[11] | — | * | 2,430,925 | 7.4% | 3.9% |
| BlackRock, Inc.[12] | 1,616,289 | 5.5% | — | * | 2.6% |
| *Directors* | | | | | |
| David Bonanno | 12,827 | * | — | * | * |
| Marcy Engel | 51,925 | * | — | * | * |
| Charmel Maynard | 7,779 | * | — | * | * |
| Bharath Srikrishnan[13] | — | * | — | * | * |

| | | | | |
|---|---|---|---|---|
| *All Directors and Executive Officers as a Group (9 persons)* | 4,963,380 | 16.7% | 11,814,974 | 35.8% | 26.8% |

    *    Less than 1%

34.      Additionally, Company insiders currently own large amounts of company options, restricted stock units, and other equity awards, some of which may be exchanged for the merger consideration upon the consummation of the Proposed Transaction, not shared amongst Plaintiff and other public stockholders of the Company.

| | Company Performance Awards ($) | Company RSU Awards ($) | Company Restricted Stock Awards ($) | Total ($) |
|---|---|---|---|---|
| James S. Levin | 6,451,072 | 1,097,840 | 8,175,013 | 15,723,925 |
| Dava Ritchea | 288,506 | 370,403 | 327,721 | 986,630 |
| Wayne Cohen | 1,152,233 | 603,661 | 1,058,626 | 2,814,519 |
| David Levine | 151,718 | 463,784 | 54,022 | 669,524 |
| Hap Pollard | — | 627,176 | 32,179 | 659,355 |

36.      Moreover, certain employment agreements with certain Amedisys executives entitle such executives to severance packages should their employment be terminated under certain circumstances. These 'golden parachute' packages are significant, and will grant several directors or officers entitled to them millions of dollars, compensation not shared by Plaintiff and will be paid out as follows:

**Golden Parachute Compensation**

| | Cash ($)[1] | Equity ($)[2] | Benefits ($) | Other ($)[3] | Total ($) |
|---|---|---|---|---|---|
| James S. Levin | 12,303,136 | 15,723,925 | — | 23,176,000 | 51,203,061 |
| Dava Ritchea | 474,411 | 986,630 | — | — | 1,461,041 |
| Wayne Cohen | 820,818 | 2,814,519 | — | — | 3,635,337 |
| David Levine | 608,589 | 669,524 | — | — | 1,278,113 |
| Hap Pollard | 275,256 | 659,355 | — | — | 934,612 |

37.     Thus, while the Proposed Transaction is not in the best interests of Sculptor, Plaintiff or Company stockholders, it will produce lucrative benefits for the Company's officers and directors.

**The Materially Misleading and/or Incomplete Preliminary Proxy Statement**

38.     On August 21, 2023, the Sculptor Board caused to be filed with the SEC a materially misleading and incomplete Preliminary Proxy Statement that, in violation the Exchange Act, fails to provide Plaintiff in his capacity as a Company stockholder with material information and/or provides materially misleading information critical to the total mix of information available to Plaintiff concerning the financial and procedural fairness of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning the Sales Process leading up to the Proposed Transaction*

39.     Specifically, the Preliminary Proxy Statement fails to disclose material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction.  In particular, the Preliminary Proxy Statement fails to disclose:

    a.     As to the Special Committee, whether the committee retained the power to veto potential transactions;

    b.     Whether the confidentiality agreements entered into by the Company with Rithm differed from any other unnamed confidentiality agreement entered into between the Company and an interested third parties; and

    c.     All specific conditions under which any standstill provision contained in any entered confidentiality agreement entered into between the Company

and potentially interested third parties throughout the sales process, including Rithm, would fall away.

*Omissions and/or Material Misrepresentations Concerning Sculptor and Rithm Financial Projections*

40.    The Preliminary Proxy Statement fails to provide material information concerning financial projections for Sculptor and Rithm provided by Sculptor management to the Board and PJT Partners and J.P. Morgan and relied upon by PJT Partners and J.P. Morgan in their analyses.

41.    Notably, the Preliminary Proxy Statement reveals that as part of its analyses, PJT Partners reviewed, "certain internal information concerning the business, financial condition and operations of the Company prepared and furnished to PJT Partners by the management of the Company."

42.    Additionally, the Preliminary Proxy Statement reveals that as part of its analyses, PJT Partners also reviewed, "certain internal financial analyses, estimates and forecasts relating to the Company, including projections for fiscal years 2023E through 2026E that were prepared by or at the direction of approved for PJT Partners' use by the management of the Company and by the Special Committee."

43.    The Preliminary Proxy Statement further reveals that, as part of its analyses, J.P. Morgan reviewed "certain internal financial analyses and forecasts prepared by the management of the Company relating to its business."

44.    The Preliminary Proxy Statement should have, but fails to provide, certain information in the projections that Sculptor management provided to the Board, PJT Partners, and J.P. Morgan.  Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors.  Investors can come up with their own estimates of

- 14 -

discount rates or [] market multiples.  What they cannot hope to do is replicate management's inside view of the company's prospects."  *In re Netsmart Techs., Inc. S'holders Litig*., 924 A.2d 171, 201-203 (Del. Ch. 2007).

45.     With respect to the *Transaction Forecasts*, the Preliminary Proxy Statement fails to disclose:

a.  The inputs, metrics, and assumptions used to determine Assets Under Management, Specifically, the Preliminary Proxy Statement fails to disclose:

i.  For multi-strategy and opportunistic credit funds, the net asset value of those funds plus any unfunded commitments through those funds;

ii.  For Institutional Credit Strategies, the amount of equity outstanding for CLOs and CBOs (during the warehouse period) and the par value of the collateral assets and cash held (after warehouse period); the adjusted portfolio appraisal values for the aircraft collateral within the securitization for aircraft securitization vehicles; and net asset value of other investment vehicles within the Institutional Credit Strategy;

iii.  For real estate funds, the amount of capital committed by fund investors during the investment period and the amount of actual capital invested for periods following the investment period, and unfunded commitments that will be funded through transfers from other funds;

b.  The inputs, metrics, and assumptions used to determine Total Management Fees, including AUM from the beginning of each quarter; capital inflows and redemptions; and the deferral of subordinated management fees from certain CLOs;

c.  The inputs, metrics, and assumptions used to determine Total Realized Incentive Income, including the total amount of incentive income for which it is deemed probable that a significant reversal will not occur; the hurdle rate used; and carried interest expense;

d.  The inputs, metrics, and assumptions used to determine Performance-Related Earnings, including realized incentive income, variable compensation expense, and carried interest expense;

e.  The inputs, metrics, and assumptions used to determine Adjusted Fee Related Earnings, including management fees, other revenues, salaries and benefits, fixed minimum bonuses, and selling, general and administrative expenses and interest expense;

f.  The inputs, metrics, and assumptions used to determine ABURI Adjusted Performance Related Earnings, including performance-related earnings, accrued but unrecognized accrued at the fund level on the Company's longer-term assets under management that has not yet been recognized in its revenues; and

g.  The inputs, metrics, and assumptions used to determine ABURI Adjusted Distributable Earnings, including distributable earnings, Economic Income, amounts payable for taxes and the tax receivable agreement, and Opportunistic Credit ABURI earned in the year (vs. recognized), including carried interest.

46.  With respect to the *Standalone Strategy Forecasts*, the Preliminary Proxy Statement fails to disclose:

a. The inputs, metrics, and assumptions used to determine Assets Under Management, Specifically, the Preliminary Proxy Statement fails to disclose:

   i. For multi-strategy and opportunistic credit funds, the net asset value of those funds plus any unfunded commitments through those funds;

   ii. For Institutional Credit Strategies, the amount of equity outstanding for CLOs and CBOs (during the warehouse period) and the par value of the collateral assets and cash held (after warehouse period); the adjusted portfolio appraisal values for the aircraft collateral within the securitization for aircraft securitization vehicles; and net asset value of other investment vehicles within the Institutional Credit Strategy;

   iii. For real estate funds, the amount of capital committed by fund investors during the investment period and the amount of actual capital invested for periods following the investment period, and unfunded commitments that will be funded through transfers from other funds;

b. The inputs, metrics, and assumptions used to determine Total Management Fees, including AUM from the beginning of each quarter; capital inflows and redemptions; and the deferral of subordinated management fees from certain CLOs;

c. The inputs, metrics, and assumptions used to determine Total Realized Incentive Income, including the total amount of incentive income for which it is deemed probable that a significant reversal will not occur; the hurdle rate used; and carried interest expense;

d. The inputs, metrics, and assumptions used to determine Economic Income, including pre-tax operating performance; equity-based compensation expenses, net of cash settled RSUs; amounts related to non-cash interest expense accretion on term debt; depreciation and amortization expenses, changes in fair value of warrant liabilities, changes in the tax receivable agreement liability, net losses on retirement of debt, gains and losses on fixed assets, and gains and losses on investments in funds; impairment of right-of-use lease assets; rent expense offset by subrental income; income allocations to executive managing directors on their direct interests in the Operating Partnerships and their consolidated subsidiaries; and amounts related to the consolidated entities;

e. The inputs, metrics, and assumptions used to determine Adjusted Fee Related Earnings, including management fees, other revenues, salaries and benefits, fixed minimum bonuses, and selling, general and administrative expenses and interest expense;

f. The inputs, metrics, and assumptions used to determine ABURI Adjusted Economic Income, including economic income, accrued but unrecognized income, and one-time general, administrative and operating expenses;

g. The inputs, metrics, and assumptions used to determine ABURI Adjusted Distributable Earnings, including distributable earnings, Economic Income, amounts payable for taxes and the tax receivable agreement, and Opportunistic Credit ABURI earned in the year (vs. recognized), including carried interest;

h.  The inputs, metrics, and assumptions used to determine ABURI Adjusted Distributable Earnings, excluding Net CLO Income, including Net CLO Income; ABURI Adjusted Distributable Earnings; and collateralized loan obligation risk retention income, net of collateralized loan obligation risk retention interest expense;

i.  The inputs, metrics, and assumptions used to determine Post-Tax Unlevered Free Cash Flow; and

j.  The inputs, metrics, and assumptions used to determine Fully-Burdened Unlevered Free Cash Flow.

47.  Specifically, the Preliminary Proxy Statement's failure to disclose substantive material projection data prevents Plaintiff from being fully informed as to the nature of the Proposed Transaction and preventing him from making a fully informed decision on whether to vote in favor of the same.

48.  This information is necessary to provide Plaintiff, in his capacity as a Company stockholder, with a complete and accurate picture of the sales process and its fairness.  Without this information, Plaintiff is not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

49.  Without complete and accurate projection data for Sculptor or Rithm being presented in the Preliminary Proxy Statement, Plaintiff is unable to properly evaluate the Company's true worth, the value of the merger consideration, the accuracy of PJT Partners and J.P, Morgan's financial analyses, or make an informed decision whether to vote in favor of the Proposed Transaction.  As such, the Board has violated the Exchange Act by failing to include such information in the Preliminary Proxy Statement.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses by PJT Partners*

50.     In the Preliminary Proxy Statement, PJT Partners describes its fairness opinion and the various valuation analyses performed to render such opinion.  However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.  Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinions.

51.     Additionally, PJT Partners offered no opinion or view as to the fairness of the Proposed Transaction for holders Class B Common Stock and Partnership Units, depriving stockholders of full and complete analyses.

52.     With respect to the *Selected Comparable Company Analysis*, the Preliminary Proxy Statement fails to disclose:

    a.  Any specific multiple reference range utilized, and the specific inputs and assumptions used to determine the same;

    b.  The inputs, metrics, and assumptions used for the ratios and multiples analyzed, including: price per share as a multiple of adjusted distributable earnings per share (calculated for the Select Public Comparables as share price divided by distributable earnings per share for the immediately following twelve months ("P / NTM Adj. DE per Share"));

    c.  The share price on July 21, 2023 for the selected companies;

    d.  The implied equity value per share for each of the selected companies;

     e.  The inputs, metrics, and assumptions used to determine the multiple range of 6.5x to 8.5x for 2025E distributable earnings for accrued but unrecognized incentive income; and

     f.  The number of fully-diluted number Class A Common Stock shares outstanding for Sculptor analyzed.

53.    With respect to the *Selected Precedent Transaction Analysis*, the Preliminary Proxy Statement fails to disclose:

     a.  The closing date for the selected transactions analyzed;

     b.  The inputs, metrics, and assumptions used to determine the stock price per share of the target company in the transaction as a multiple of the target company's adjusted distributable earnings per share for the 12 months immediately preceding the transaction;

     c.  The acquisition equity values of the selected target companies;

     d.  The implied equity value per share for each of the selected companies;

     e.  The inputs, metrics, and assumptions used to determine P / LTM Adj. DE per Share range of 8.5x to 10.5x for the Company;

     f.  The inputs, metrics, and assumptions used to determine a range of implied prices per share of Class A Common Stock; and

     g.  The number of fully-diluted number Class A Common Stock shares outstanding for Sculptor analyzed.

54.    With respect to the *Discounted Cash Flow Analysis*, the Preliminary Proxy Statement fails to disclose:

a.  The Company's projected after-tax unlevered free cash flows for the period from June 30, 2023 through fiscal year end 2026E utilized;

b.  The ranges of "terminal values" of the Company as of fiscal year end 2026 utilized;

c.  The range of selected discount rates utilized;

d.  The terminal values estimated;

e.  The inputs, metrics, and assumptions used to determine the perpetuity growth rate range of 3.0% to 4.0%;

f.  The Company's after-tax unlevered free cash flow as of 2026E utilized;

g.  The inputs, metrics, and assumptions used to determine discount rates ranging from 12.5% to 14.5%;

h.  Sculptor's weighted average cost of capital utilized; and

i.  The estimated enterprise value for the Company;

j.  The inputs, metrics, and assumptions used to determine the implied equity values per share of Class A Common Stock, including:

    i.  The Company's cash;

    ii.  The Company's investments in funds and collateralized loan obligations;

    iii.  The inputs metrics, and assumptions used to determine the range of implied equity values per Partnership Unit, including the debt from the estimated enterprise value derived using the discounted cash flow method and the number of fully diluted Partnership Units shares outstanding as of July 22, 2023;

iv.  The present value of certain tax benefits attributable to the holders of shares of Class A Common Stock;

v.  The present value of certain payments under the Company's tax receivable agreement attributable to the holders of shares of Class A Common Stock,

55.  These disclosures are critical for Plaintiff to be able to make an informed decision on whether to vote in favor of the Proposed Transaction.

56.  Without the omitted information identified above, Plaintiff is missing critical information necessary to evaluate whether the proposed consideration truly maximizes his value and serves his interest as a stockholder.  Moreover, without the key financial information and related disclosures, Plaintiff cannot gauge the reliability of the fairness opinion and the Board's determination that the Proposed Transaction is in his best interests as a public Sculptor stockholder.  As such, the Board has violated the Exchange Act by failing to include such information in the Preliminary Proxy Statement.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses by J.P. Morgan*

57.  In the Preliminary Proxy Statement, J.P. Morgan describes its fairness opinion and the various valuation analyses performed to render such opinion.  However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.  Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinions.

58.     Additionally, J.P. Morgan offered no opinion or view as to the fairness of the Proposed Transaction for holders of Class B Common Stock and Operating Partnership units, depriving stockholders of full and complete analyses.

59.     With respect to the Trading Multiples Analysis, the Preliminary Proxy Statement fails to disclose:

a.   The ratio of such company's current stock price to its projected distributable earnings per share for calendar year 2024, and the specific inputs and assumptions used to determine the same;

b.   The closing prices for the selected companies utilized; and

c.   The inputs, metrics, and assumptions used to determine the multiple reference range for P / DE 2024E of 4.0x to 10.5x.

60.     With respect to the Discounted Cash Flow Analysis, the Preliminary Proxy Statement fails to disclose:

a.   The fully-burdened unlevered free cash flows J.P. Morgan calculated that the Company is expected to generate April 1, 2023 through December 31, 2026 and the inputs, metrics, and assumptions used to determine the same;

b.   The net present value of certain tax receivables of the Company calculated and the inputs, metrics, and assumptions used to determine the same;

c.   The range of implied terminal values for Sculptor utilized;

d.   The inputs, metrics, and assumptions used to determine the perpetual growth rates ranging from 2.0% to 3.0%;

e.   The inputs, metrics, and assumptions used to determine the discount rate ranging from 10% to 12%;

    f.   Sculptor's weighted average cost of capital utilized;

    g.   The net debt for Sculptor utilized; and

    h.   The value of the Company Warrants calculated and the Black Scholes valuation methodology inputs utilized by J.P. Morgan.

61.    The Preliminary Proxy Statement fails to disclose other "*Miscellaneous*" material financial analyses conducted by J.P. Morgan.

62.    These disclosures are critical for Plaintiff to be able to make an informed decision on whether to vote in favor of the Proposed Transaction.

63.    Without the omitted information identified above, Plaintiff is missing critical information necessary to evaluate whether the proposed consideration truly maximizes his value and serves his interest as a stockholder.  Moreover, without the key financial information and related disclosures, Plaintiff cannot gauge the reliability of the fairness opinion and the Board's determination that the Proposed Transaction is in his best interests as a public Sculptor stockholder.  As such, the Board has violated the Exchange Act by failing to include such information in the Preliminary Proxy Statement.

## FIRST COUNT

### Violations of Section 14(a) of the Exchange Act

### (Against All Defendants)

64.    Plaintiff repeats all previous allegations as if set forth in full herein.

65.    Defendants have disseminated the Preliminary Proxy Statement with the intention of soliciting stockholders, including Plaintiff, to vote in favor of the Proposed Transaction.

66.    Section 14(a) of the Exchange Act requires full and fair disclosure in connection with the Proposed Transaction.  Specifically, Section 14(a) provides that:

67.     It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title.

68.     As such, SEC Rule 14a-9, 17 C.F.R. 240.14a-9, states the following:

69.     No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

70.     The Preliminary Proxy Statement was prepared in violation of Section 14(a) because it is materially misleading in numerous respects and omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, Defendants knew or should have known that the Preliminary Proxy Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

71.     The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

72.     The Individual Defendants were at least negligent in filing a Preliminary Proxy Statement that was materially misleading and/or omitted material facts necessary to make the Preliminary Proxy Statement not misleading.

73.     The misrepresentations and omissions in the Preliminary Proxy Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to decide whether to vote his shares in favor of the Proposed Transaction on the basis of complete information if such misrepresentations and omissions are not corrected prior to the stockholder vote regarding the Proposed Transaction.

**SECOND COUNT**

**Violations of Section 20(a) of the Exchange Act**

**(Against all Individual Defendants)**

74.     Plaintiff repeats all previous allegations as if set forth in full herein.

75.     The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or should have known that the Preliminary Proxy Statement was materially misleading to Plaintiff in his capacity as a Company stockholder.

76.     The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein.   The Individual Defendants were aware or should have been aware that materially false and misleading statements were being issued by the Company in the Preliminary Proxy Statement

and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws.  The Individual Defendants were able to, and did, control the contents of the Preliminary Proxy Statement.  The Individual Defendants were provided with copies of, reviewed and approved, and/or signed the Preliminary Proxy Statement before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

77.     The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Sculptor's business, the information contained in its filings with the SEC, and its public statements.  Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being concealed from Plaintiff and Company, and that the Preliminary Proxy Statement was misleading.  As a result, the Individual Defendants are responsible for the accuracy of the Preliminary Proxy Statement and are therefore responsible and liable for the misrepresentations contained herein.

78.     The Individual Defendants acted as controlling persons of Sculptor within the meaning of Section 20(a) of the Exchange Act.  By reason of their position with the Company, the Individual Defendants had the power and authority to cause Sculptor to engage in the wrongful conduct complained of herein.  The Individual Defendants controlled Sculptor and all of its employees.  As alleged above, Sculptor is a primary violator of Section 14 of the Exchange Act and SEC Rule 14a-9.  By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff demands injunctive relief, in his favor and against the Defendants, as follows:

A.      Enjoining the Proposed Transaction;

B.      In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff;

C.      Directing the Individual Defendants to exercise their fiduciary duties to disseminate a Preliminary Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E.      Granting such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

Dated: September 07, 2023

**BRODSKY & SMITH**

By: *Evan J. Smith*

Evan J. Smith
240 Mineola Boulevard
Mineola, NY  11501
Phone:  (516) 741-4977
Facsimile (561) 741-0626

*Counsel for Plaintiff*

- 29 -